IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **AUTUMN N. CROUCH,** *Special Administrator of the Estate of Jacob Russell Steward, deceased*, | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| vs. | ) Case No. 17-cv-1089-SMY<br>) |
| **TAYLOR LOGISTICS COMPANY, LLC, POLLOCK LOGISTICS, LLC, JEFFREY F. HALL, JR., HALL TRANSPORTATION, LLC, and DEBRA K. POLLOCK,** *individually and as Personal Representative of the Estate of Walter Pollock, Deceased*, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | )<br>) |
| AND | )<br>) |
| **KIMBERLY D. BOSEL,** *Individually, and as Independent Representative of the Estate of Eric A. Bosel*, | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| vs. | ) Case No. 17-cv-1280-SMY<br>) |
| **TAYLOR LOGISTICS COMPANY, LLC, POLLOCK LOGISTICS, LLC, JEFFREY F. HALL, JR., HALL TRANSPORTATION, LLC, and DEBRA K. POLLOCK,** *individually and as Personal Representative of the Estate of Walter Pollock, Deceased*, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | ) |

**MEMORANDUM AND ORDER**

**YANDLE, District Judge:**

Decedents Eric A. Bosel and Jacob Russell Stewart died as a result of a motor vehicle

accident that occurred on July 27, 2017 in Stanford Township, Illinois. Their vehicles were struck by a Freightliner tractor-trailer being driven by Defendant Walter B. Pollock[1]. Representatives of Decedents' estates filed suit (consolidated herein) asserting negligence and wrongful death claims against Pollock, Pollock Logistics, LLC (the "Pollock Defendants"), Taylor Logistics Company LLC ("TLC"), Jeffrey F. Hall, Jr., and Hall Transportation, LLC (the "Hall Defendants"). Plaintiffs subsequently settled their claims against the Hall Defendants (Doc. 264) and the Pollock Defendants (Doc. 266); their claims against TLC remain pending.

In the Third Amended Complaint, Plaintiffs allege that TLC is vicariously liable for Pollock's actions (Count II) and that TLC was negligent in its hiring of Pollock (Count III). The case is now before the Court for consideration of TLC's Motion for Summary Judgment (Doc. 239) which Plaintiffs oppose (Doc. 256). For the following reasons, the motion is **GRANTED**.

## Factual Background

Construed in the light most favorable to Plaintiffs, the evidence and reasonable inferences establish the following facts relevant to the pending motion:

TLC is a subsidiary of Taylor Fresh Foods, which also owned Taylor Farms (Doc. 256-1, at pp. 12-13). TLC, a broker, handles the logistics for Taylor Farms, including contracting with common carriers for the transportation of products for Taylor Fresh Foods (Doc. 256-1, pp. 5-6, 13, 16). TLC holds its own Department of Transportation ("DOT") number as a broker and has "Authority for Hire" – meaning it can hire people to transport goods (Doc. 240-1, p. 78).

Hall Transportation is a motor carrier licensed and authorized to haul freight by the DOT (Doc. 197-1, Declaration of Jeffrey J. Hall, ¶ 2). It has been in business since 2007 and is owned

---

[1] Pollock died in December 2019. Following his death, and pursuant to Federal Rule of Civil Procedure 25(a)(1), Debra K. Pollock, as Personal Representative of the Estate of Walter B. Pollock, Deceased was substituted for Pollock on June 12, 2020 (*See* Doc. 172).

by Jeffrey Hall (Doc. 240-2, p. 10).  At the time of the accident, Hall Transportation did not have brokerage authority under the Federal Motor Carriers Safety Administration ("FMCSA") (Doc. 256-2, p. 21).  Hall Transportation has 17-18 drivers, 18 trucks and 19 trailers (Doc. 240-2, pp. 22-23).  Hall's safety director is responsible for hiring and firing drivers, performing the necessary background checks and qualification examinations, and complying with the Federal Motor Carriers Safety Regulations ("FMCSR") as it relates to its drivers (Doc. 240-2, pp. 34-35).  Hall Transportation maintains a physical file on each driver that includes a copy of their driver's license and other pertinent materials.  *Id*.

TLC and Hall Transportation entered into a Broker/Carrier Agreement (the "Agreement") on August 7, 2013 (Doc. 256-6).  Thereafter, TLC regularly used Hall Transportation to pull approximately 10-15 loads per month (Doc. 240-1, pp. 29-30).  The Agreement provided in pertinent part:

> Hall Transportation shall, at all times and at its own expense, provide and maintain: (a) safe and adequate freight handling facilities; (b) sufficient, duly qualified, competent, skilled and properly trained and licensed drivers; (c) all other personnel, motor vehicles and transportation related equipment in good working order, as necessary to perform all required transportation services in a safe manner; (d) all requisite operating permits and authorities, in full compliance with all applicable federal, state, territorial and local statutes and regulations (Doc. 256-6, at ¶ 2)…
>
> The relationship between TLC and Hall Transportation shall at all times, be that of independent contractors.  Hall Transportation and any of its subcontractors or agents shall employ, pay, supervise, direct, discipline, discharge and assume full responsibility for all persons required for the performance of Hall Transportation's duties under this Agreement. Under no circumstances shall Hall Transportation or any of its subcontractors, agents or employees be deemed to hold themselves out as employees of TLC or any customer.  Hall Transportation agrees that it shall look only to TLC for payment of any amounts due Hall Transportation for services rendered to customers under this Agreement (Doc. 256-6, at ¶ 8)…
>
> Hall Transportation agrees not to co-broker any shipment tendered to Hall Transportation by TLC without the advance written authorization of TLC. Violation of this policy shall be grounds for immediate termination of this Agreement.  If TLC becomes aware of such co-brokering activity by Hall

> Transportation prior to payment of any compensation otherwise due Hall Transportation, TLC shall withhold payment to Hall Transportation and shall instead pay appropriate compensation to the carrier who actually transported the shipment. TLC will interpret any acceptance of a shipment by Hall Transportation as a common or contract carrier and subsequent subcontracting of the shipment to any third party as an assignment of the right to be compensated for that shipment to the third party (Doc. 256-6, at ¶ 11).

The Agreement also required Hall Transportation to maintain a "Satisfactory" DOT safety rating at all times and to maintain $ 1 million of insurance coverage (Doc. 256-6, ¶¶ 5, 6).

TLC confirmed that Hall Transportation had sufficient insurance and checked its annual accident reporting on the FMCSR Safety and Fitness Electronic Records ("SAFER") website (Doc. 256-1, pp. 32-35). SAFER provides contains information regarding the accident history of a carrier, how the carrier compares to the National Averages, and whether its license has ever been revoked. *Id*. It provides the carriers motor carrier ("MC") and DOT numbers, and insurance information (Doc. 256-1, p. 51). According to Patricia Manley, TLC's National Logistics Manager, TLC reviewed this information in part for safety reasons and to prevent accidents, injuries, and fatalities. *Id.* at p. 104.

Hall Transportation completed a Carrier Profile Questionnaire when the Agreement was executed (Doc. 240-1, p. 82-83). The Questionnaire sought Hall Transportation's MC number, a W-9, insurance information, DOT number and references. *Id*. The Questionnaire also sought the number of trucks and trailers Hall Transportation owned. Hall Transportation noted that it owned 18 tractors and 18 reefers (refrigerated trailers) and that it had 18 brokered trucks. *Id*.

In executing the Agreement, Manley assumed that Hall Transportation may have 18 trucks brokered. *Id*. However, per the contract, Hall Transportation was required to utilize its own trucks to pull TLC brokered loads (Doc. 240-1, pp. 82-83). Steve Morris, Hall Transportation's dispatcher, testified that Hall Transportation never had 18 brokered trucks (Doc. 240-5, p.93).

Jeffrey Hall testified that TLC did not interfere with the way he ran his business, other than the requirements in the Agreement (Doc. 240-2, pp.132-134). TLC did not have a relationship with Hall Transportation drivers. *Id*. at p. 134. Hall Transportation maintained its own trucks and trailers. *Id*. TLC was not involved in determining the routes Hall Transportation trucks took or where they fueled. *Id*. at pp. 137-138. TLC had nothing to do with Hall Transportation driver's hours of service. *Id*. All driver communications were from Hall Transportation, which then communicated to TLC. *Id*. TLC had no direct contact with drivers. *Id*.

Hall Transportation entered into a contract with Walter Pollock on July 19, 2017 (Doc. 240-2, p. 39). Hall Transportation maintained a payroll file on Pollock, which included a copy of his insurance (Doc. 240-2, p. 46). Pollock was paid by the trip, based on the gross for the load less fuel (Doc. 240-2, pp. 60-61). At the time of the accident, Pollock held DOT permits and licenses for "Walter Pollock, individual" (Doc. 256-3, ¶ 10).

On July 22, 2017, Hall Transportation received a Load Confirmation Sheet from TLC identifying Hall Worldwide as the carrier (Doc. 240-1, pp. 20-21). The Sheet included the pick-up location, delivery location, rate for the transport, and product description for the load. *Id*. Hall Transportation was to pick up a load of produce from Taylor Farms Retail located in Salinas, CA and deliver it to a Sam's Club in Olney, IL. *Id*. at pp. 23-24. Hall Transportation was to be paid $4,322.02 for the transport. *Id*. Ken Manley, TLC's account manager, testified that it was TLC's expectation that Hall Transportation would provide its own truck for the haul. *Id*.

On the day of the accident, Pollock was pulling a Hall Transportation trailer (Doc. 240-3, p. 50). Hall Transportation told him when the shipment was to take place and provided the pickup and delivery dates (Doc. 240-3, p. 50). *Id*. Hall Transportation controlled where the shipments would be picked up and delivered and Pollock had to agree to Hall Transportation's procedures

and guidelines for the shipments. *Id*. Hall Transportation paid Pollock for the shipments. *Id*. The terms and timing of payment were controlled by Hall Transportation. *Id*. Other than the actual pickup and delivery, Hall Transportation was the only point of contact for Pollack. (Doc. 240-3, p. 53).

Hall Transportation controlled the amount of insurance Pollock was required to carry, provided the background check on Pollock as a driver, and controlled the timing of his expense reimbursement. *Id.* at p. 54. Hall controlled the contract terms and the remedies if the contract was breached. *Id.* at p. 55. Pollock never interacted with anyone at TLC. *Id.* at p. 91.

At the time of the accident, Pollock had methamphetamine in his system and was impaired (Doc. 256-4, p. 3; Doc. 256-5, p. 3). He never told anyone at Hall Transportation that he was using methamphetamine (Doc. 240-3, p. 55). Pollock was an unrated carrier at the time of the accident (Doc. 256-7, pp. 82-83).

Ken Manley was the account manager for TLC at the time of the accident. His responsibilities included imputing delivery loads, making delivery appointments, contacting the carrier to see if they could cover loads, and staying in contact with the carrier to make sure they were on time (Doc. 240-6, pp. 11-12). Manley did not have contact with the drivers assigned by carriers. *Id*. at p. 14. He did not know Pollock prior to the accident. *Id.* at p. 30. Manley defined "double brokering" as when TLC would give a load to a carrier and the carrier would turn around and broker it to somebody else (Doc. 256-9, p. 38). Manley testified that double brokering was against TLC's policy (Doc. 256-9, p. 39).

Steve Morris has been a Hall Transportation dispatcher since 2014 (Doc. 240-5, p. 10). His job duties include assigning loads to drivers, providing load information, and telling drivers where they are supposed to be to pick up and deliver loads. *Id.* He was Manley's only contact at Hall

Transportation (Doc. 240-6, p. 33).  According to Morris, non-Hall Transportation drivers and trucks were called owner-operators (Doc. 240-5, p. 12). He provided the same information to these drivers as he did to employee drivers.  *Id*. at p. 12.  TLC was not provided any information about the drivers or carriers that Morris assigned to its loads.  *Id* at pp. 30-31.

At some point prior to the accident, Morris told Kenneth Manley that Hall Transportation had some owner-operators that were hauling loads for Hall Transportation.  *Id*. at p. 47.  Morris did not know if Manley understood that they were owner-operators independent or if they were lease-to-own with Hall Transportation.  *Id*.  According to Morris, Manley was not aware that Pollock was hauling loads for Hall Transportation.  *Id*.

Jeffrey Hall testified that Morris had told Manley that Hall Transportation utilized outside drivers (Doc. 240-2, pp. 67-69) and that TLC never asked Hall Transportation about its drivers' qualifications or for documentation of their DOT or safety records.  *Id*.

## Discussion

TLC argues that Plaintiffs' state-law negligence claims are preempted by the Federal Aviation Administration Authorization Act (the "FAAAA").  It further argues that even if Plaintiffs' substantive claims are not preempted, there is no genuine issue of material fact preventing judgment as a matter of law on Counts II and III of Plaintiffs' Third Amended Complaint.

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact – that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).  If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted.  *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

**Preemption**

Pursuant to the Federal Aviation Administration Authorization Act, "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). That said, the Act does not "… restrict the safety regulatory authority of a State with respect to motor vehicles. . . ." 49 U.S.C. § 14501(c)(2)(A); *City of Columbus v. Our Garage and Wrecker Service, Inc.*, 536 U.S. 424, 439 (2002) ("Congress' clear purpose in §14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, §14501(c)(1), not restrict the preexisting and traditional state police power over safety." (quotation marks omitted)). Two conditions must be met for FAAAA preemption: "First, a state must have enacted or attempted to enforce a law. Second, that law must relate to carrier rates, routes, or services either by expressly referring to them, or by having a significant economic effect on them." *Id*.

TLC argues that negligence laws that have a direct and substantial impact on the way in which freight brokers hire and oversee transportation companies hinder the objectives of the FAAAA and are therefore preempted. While the Seventh Circuit has not addressed whether state law negligence claims such as Plaintiffs' claims herein are preempted by the FAAAA, district courts who have specifically taken up the question of whether the FAAAA preempts claims of negligence by brokers in selecting and retaining motor carriers and their employees are divided. *See Scott v. Milosevic*, 372 F.Supp.3d 758, 769 (N.D. Iowa 2019) (finding no FAAAA preemption

because negligent hiring claims are not sufficiently related to the services of a broker); *ASARCO LLC v. England Logistics Inc.*, 71 F.Supp.3d 990 (D. Ariz. 2014) (finding FAAAA preempts negligence claims against a broker); *see also*, *Gillum v. High Standard, LLC*, 2020 WL 444371 (W.D. Tex. 2020) (collecting cases). Additionally, the Ninth Circuit Court of Appeals recently considered preemption under a similar set of circumstances and concluded that while negligence claims related to a motor vehicle accident are within the scope of the FAAAA's preemption provision, the safety exception applies and permits negligence claims to stand. *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016 (9th Cir. 2020).

Significant here, in *Miller*, the plaintiff alleged that a freight broker negligently hired an unsafe motor carrier that caused an accident resulting in severe injuries. *Id*. 976 F.3d at 1020. The Court noted that the selection of a motor carrier is a core function of a broker and that state negligence laws, while not specifically dictating behavior, "[impose] an obligation on brokers at the point at which they arrange for transportation by [a] motor carrier." *Id*. at 1024-5. Nevertheless, the court concluded that the safety exception applies because a states' power "plainly includes the ability to regulate safety through common-law tort claims." *Id*. at 1026.

The undersigned finds the *Miller* Court's analysis persuasive and consistent with Congress' intent that the FAAAA regulate economic activity, not safety. *Id*. 536 U.S. at 439. Brokers may be required to use ordinary care to vet motor carriers. While that may in turn result in increased costs, Illinois certainly has an interest in regulating the safety of drivers on the road, including trucks. Its negligence laws serve that function by permitting these types of tort actions to proceed. As the Ninth Circuit correctly observed, there is "nothing in the FAAAA's legislative history that suggests that Congress intended to eliminate this important component of the States' power over safety." *Miller*, 976 F.3d at 1026; *see also Ne. Rural Elec. Membership Corp. v. Wabash Valley*

*Power Ass'n*, 707 F.3d 883, 895 (7th Cir. 2013). This view aligns with the Seventh Circuit's limited application of complete preemption, which "requires a clear showing of Congressional intent to eliminate state law entirely." *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 895 (7th Cir. 2013); *In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010) ("We have likewise recognized the narrowness of the doctrine, applying complete preemption only where Congress clearly intended completely to replace state law with federal law and create a federal forum."). As such, this Court concludes that Plaintiffs' negligence claims are not preempted by the FAAAA.

### Vicarious Liability (Count II)

As a general rule, a person who is injured by the negligence of another must seek his remedy from the individual who caused the injury. *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463 (2011). However, an exception may be triggered by a principal-agent relationship. The "cardinal consideration" for determining the existence of an agency relationship is whether the alleged principal has the "right to control the manner of work performance." *Sperl*, 946 N.E.2d at 471. Other considerations include whether the principal has the right to discharge the purported agent, the method of payment and whether taxes are deducted, the provision of equipment, and the level of skill required. *Id.* Although weighing the relevant factors typically involves questions of fact, a court may decide the issue if the underlying facts are not in dispute. *Kolchinsky v. W. Dairy Transp., LLC,* 949 F.3d 1010, 1013 (7th Cir. 2020).

"Illinois courts have consistently declined to find an agency relationship when a company hires an independent driver to deliver a load to designated persons at designated hours but does not reserve the right to control the manner of delivery." And in this case, the undisputed facts

establish as a matter of law that Pollock and Hall Transportation were not agents of TLC. *Kolchinsky*, 949 F.3d at 1014.

There is nothing in the record supporting even an inference that TLC controlled Pollock. Pollock testified that he did not have contact with TLC employees. His relevant communications and interactions were all with Hall Transportation. He was pulling a Hall Transportation trailer on the day of the accident, and Hall Transportation controlled when and where the shipments would be picked up and delivered. Pollock was required to follow Hall Transportation's procedures and guidelines for the shipments. Hall Transportation paid Pollock for the shipments and controlled the terms and timing of payment. Hall Transportation controlled the amount of insurance coverage Pollock was required had to have.

As for Hall Transportation, Jeffrey Hall testified that TLC did not interfere with the way he ran his business, other than the requirements in the Agreement. Both TLC and Hall Transportation were independent contractors under the Agreement. TLC did not have a relationship with Hall Transportation drivers and was not involved in determining the routes Hall Transportation trucks took or where they fueled. Hall Transportation maintained its own trucks and trailers and had the sole authority over its drivers, including hiring, training, supervising, and conducting background checks. Hall Transportation controlled the amount of insurance coverage required for its drivers, controlled the timing of expense reimbursement, and the established the contract terms between it and its drivers. It paid its drivers directly and provided them, including Pollock, with procedures and guidelines for shipping.

In sum, there is a dearth of evidence showing the degree of control commensurate with the existence of an agency relationship under Illinois law. *See, e.g., Sperl*, 946 N.E. 2d at 471–72 (upholding a finding of agency relationship where the broker specified the trailer length, required

the driver to take the trailer temperature regularly, and imposed strict communication requirements and delivery times enforced by fines); *see also Powell v. Dean Foods Co.*, 7 N.E.3d 675, 698 (2013) (upholding a finding of agency relationship where the trial evidence showed that the shipping company controlled the drivers' actions, required drivers to wear uniforms, and provided trailers; and the evidence also showed that the driver pulled exclusively for the company for 60 years and used its letterhead). Accordingly, TLC is entitled to summary judgment on Count II of Plaintiffs' Third Amended Complaint.

## Negligent Hiring

Plaintiffs allege that TLC failed to exercise ordinary care in the hiring, training, and supervision of Pollock, that it negligently entrusted Pollock with the activity of commercial trucking, failed to ensure that he complied with FMCS regulations, and allowed a double brokerage arrangement to occur in violation of the Federal Motor Carrier Safety Regulations and the provisions of MAP-21 (Doc. 207, ¶ 57).

In Illinois, one who employs an independent contractor is not liable for the latter's acts or omissions unless the employing party fails to use reasonable care in selecting the contractor or directs the contractor to commit the act in question. *Hayward v. C.H. Robinson Co.*, 24 N.E.3d 48, 55 (Ill. App. Ct. 2014); *Lang v. Silva,* 715 N.E.2d 708, 718 (Ill. App. Ct. 1999). To succeed in a claim alleging negligent hiring or retention of an independent contractor, a plaintiff must prove that: (1) the principal negligently hired or retained the independent contractor, (2) when principal knew or should have known that the contractor was unfit for the required contracted job (3) so as to create a danger of harm to other third parties. *Hayward,* 24 N.E.3d at 55.

A claim of negligent hiring requires a showing of some agency or hiring relationship between the party said to have caused the injury and the entity sought to be held liable for such

negligent hiring. No such relationship existed between Pollock and TLC. Again, the undisputed material facts establish that TLC was not Pollock's employer – it did not hire or retain Pollock and did not have any agency relationship with him. On these facts, Count III of Plaintiff's Third Amended Complaint cannot survive summary judgment,

## Voluntary Undertaking

For their response to TLC's motion for summary judgment, Plaintiff's focus heavily on a theory of liability that was not previously pleaded in the Third Amended Complaint; that TLC is liable under a voluntary undertaking theory of liability. As an initial matter, the Court must address whether Plaintiffs may assert this new theory of liability in response to summary judgment.

The Seventh Circuit has emphasized that "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014). Consequently, courts typically allow a plaintiff to pursue an alternative legal theory at the summary judgment stage based on existing allegations. But any attempt to introduce new facts at this juncture will be rejected. *Whitaker*, 772 F.3d at 808. Relatedly, courts should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant or the case's development. *Id*.

Here, Plaintiffs' voluntary undertaking theory arises from the same factual allegations in the Third Amended Complaint as their claim of an alleged improper double brokerage arrangement. And TLC has suffered no undue prejudice by Plaintiff's invocation of this new theory as it filed a reply brief addressing the merits of the claim. Therefore, the Court will allow Plaintiffs to pursue their voluntary undertaking theory and will address the merits of the claim.

"In Illinois, a party to a contract may be liable in tort to a third party who otherwise has no enforceable rights under the contract under a voluntary undertaking theory of liability."

*Jakubowski v. Alden-Bennett Constr. Co.*, 763 N.E.2d 790, 799 (2002). A party is liable for breach of a voluntary undertaking if: (a) "a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm"; (b) a party "undertakes to perform a duty that a different party was obligated to perform and then negligently fulfills its duty"; or (c) "a third party relies to its detriment on the fact that a duty has been voluntarily undertaken." *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003). Mere knowledge of a risk does not impose an affirmative duty. *Id*. Further, the duty of care imposed upon a defendant is limited to the extent of its undertaking. *Frye v. Medicare-Glaser Corp.*, 605 N.E.2d 557, 560–61 (Ill. 1992) (declining to hold that a pharmacist had a duty to warn a patient of all potential side effects of a drug merely because she chose to warn about one side effect). Whether a defendant has voluntarily undertaken a duty to a plaintiff is a question of law for the court that is properly addressed in a motion for summary judgment. *Jakubowski,* 763 N.E.2d at 799.

Plaintiffs argue that TLC voluntarily undertook two duties through its own actions arising from certain provisions in the Agreement: (1) TLC undertook a duty to ensure that any carrier that transported loads for it was properly vetted and met their minimum standard of having a "Satisfactory" safety rating; and (2) TLC undertook a policy to prohibit double-brokering of loads by the carriers it contracted with as evidenced by the Agreement. Plaintiffs maintain that TLC's failure to follow its own policies and procedures and failure to implement reasonable protections against double-brokering caused Pollock to be on the road and cause the crash that killed Plaintiffs' decedents.

Under the Agreement between TLC and Hall Transportation, Hall Transportation was required to maintain a "Satisfactory" DOT safety rating and to maintain $ 1 million of insurance coverage. To confirm that Hall Transportation was complying with these requirements, TLC

checked the FMCSR SAFER website which provided information such as the accident history of a carrier, how the carrier compared to the National Averages, and whether its license had ever been revoked. SAFER also provided the carriers motor carrier and DOT numbers, and its insurance information. The Agreement also prohibited the double-brokering of TLC loads.

Plaintiffs' argument that the provisions of the Agreement created a legal duty on TLC has been rejected by the Illinois Supreme Court. In *Rhodes v. Illinois Cent. Gulf R.R.*, 665 N.E.2d 1260, 1272 (1996), the court noted:

> "Whether a legal duty exists is a question of law and is determined by reference to whether the parties stood in such a relationship to each other that the law imposes an obligation on one to act for the protection of the other. ***Where the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines.***"

(Emphasis added). Analogous arguments have been made and also rejected by other courts. *See Castro v. Brown's Chicken & Pasta, Inc.*, 732 N.E.2d 37, 46 (2000) (citing cases); *Blankenship v. Peoria Park Dist.,* 647 N.E.2d 287, 291 (1995) (rejecting plaintiff's argument that the defendant's internal rules requiring one lifeguard to remain on duty at all times created a legal duty to have one lifeguard on duty); *Fillpot v. Midway Airlines, Inc.,* 633 N.E.2d 237, 242 (1994) (rejecting plaintiff's argument that defendant's policy manual requiring the clearing of walkways created a legal duty on defendant's part to protect plaintiff from natural accumulations).

Plaintiffs rely heavily on *Bruntjen v. Bethalto Pizza, LLC, et al.*, 18 N.E.3d 215 (Ill. App. Ct. 2014) to support their voluntary undertaking theory. In *Bruntjen*, a franchisor appealed a trial court's order in favor of the plaintiff who was injured by the franchisee's employee, a pizza delivery driver. *Bruntjen*, 18 N.E.3d at 238. Notably, the court first held that the franchisor actively contributed to the risk that the franchisee's driver posed to others on the road by maintaining operating policies and procedures that put speed of delivery ahead of safe driving in

delivering pizzas and demonstrated significant control over the driver. *Id.* Thus, the court found that an agency relationship between the franchisor and the driver was established. As to the voluntary undertaking, the court noted that the franchisor's manual gave it the right to monitor the franchisee's adherence to the policies, force compliance with the policies, require franchisees to initiate a safe driving policy, required franchisees to obtain, update, and retain driving records for its drivers, and reserved the right to inspect for and enforce compliance. *Id.* Based on the extensive involvement of the franchisor, the court concluded that the franchisor undertook the duty and failed to monitor the driver's driving record as defined in the franchisor's manual. *Id.*

*Bruntjen* is easily distinguishable from the instant case. Nothing in the Agreement establishes a similar level of control. Nor did TLC exert any control over the actions of Hall Transportation or, by extension, Pollock pursuant to the Agreement. To the contrary, the Agreement explicitly provided that Hall Transportation was an independent contractor that ran its own business without input from TLC. The scope of any relevant undertaking by TLC was limited to confirming that Hall Transportation had insurance and a satisfactory rating pursuant to the Agreement. Nothing in the Agreement extended to monitoring independent contractors hired by Hall Transportation.

While the Agreement prevented Hall Transportation from double-brokering TLC loads, nothing in the Agreement required TLC to preemptively take action to prevent a potential breach of contract by Hall Transportation. Obviously, if TLC discovered that Hall Transportation was double brokering, it could withhold payment from Hall Transportation and pay the carrier that transported the shipment. But TLC took on no obligation of "reasonable care" for third parties under the Agreement.

Plaintiffs also point to the Questionnaire Hall Transportation completed upon execution of the Agreement. In the Questionnaire, Hall Transportation stated that it had 18 brokered trucks. Hall testified that this was an error, but even giving Plaintiffs all reasonable inferences, the fact that Hall Transportation had brokered trucks does not establish that TLC knew that Hall Transportation utilized any brokered trucks for TLC loads. Patricia Manley testified that she assumed that Hall Transportation may have 18 trucks brokered, but under the Agreement, Hall Transportation was required to utilize its own trucks to pull TLC brokered loads. In any event, mere knowledge of a risk does not impose an affirmative duty. *LM ex rel. KM,* 344 F.3d at 701.

Viewing the evidence in the light most favorable to Plaintiffs, TLC is entitled to summary judgment.

## Conclusion

For the foregoing reasons, Defendant TLC's Motion for Summary Judgment (Doc. 239) is **GRANTED** in its entirety. All pending motions are **TERMINATED** as **MOOT**. As no claims remain, the Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

DATED:  September 24, 2021

**STACI M. YANDLE**
**United States District Judge**